Filed 4/19/13  P. v. Gonzalez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H037854 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS100663) |
| v. | |
| HECTOR MANUEL GONZALEZ, | |
| Defendant and Appellant. | |

Defendant Hector Manuel Gonzalez appeals after conviction, by jury trial, of two counts of residential burglary (Pen. Code, § 459),[1] one count of robbery (§ 211), and one count of false imprisonment (§ 236).  He admitted three prior prison term allegations. (§ 667.5, subd. (b).)  Defendant was sentenced to an 11-year, four-month prison term and ordered to pay a $6,600 restitution fine.

On appeal, defendant contends one of the burglary convictions must be reversed due to insufficient evidence that the residence was inhabited and because the trial court gave the wrong circumstantial evidence instruction.  Defendant contends the robbery conviction must be reversed for three reasons:  (1) because the jury might have convicted him even if it found he used force to escape, rather than to take the property; (2) because there was insufficient evidence that the victim had constructive possession of the

---

[1] Unspecified section references are to the Penal Code.

property; and (3) because the trial court directed a verdict by telling the jury that a caretaker on duty has constructive possession of the homeowner's property. Defendant also contends that pursuant to section 654, the trial court should have stayed the one-year term imposed for his robbery conviction and a portion of the restitution fine.

We agree that the term for defendant's robbery conviction should have been stayed pursuant to section 654 and that the restitution fine should have been $4,000. We will order the judgment modified.

## BACKGROUND

The charges in this case stemmed from two separate incidents. The first occurred at the home of Bette and Donald Limberg and the second occurred at the home of Josephine Williams.

### A.     *The Limberg Burglary*

In November of 2009, Donald and Bette Limberg owned a home in Carmel but did not live there full-time. They had another residence and visited the Carmel residence periodically. The Carmel residence remained fully furnished, with works of art on the walls. The Limbergs left a vehicle (a Volvo) at the residence.

The Limbergs continued to have the residence serviced by their long-time landscape contractor, Doris Mitchell. Mitchell had a key to the house and would periodically check on the condition of the interior. On November 9, 2009, Mitchell checked on the flower pots at the front door entrance to the residence. While doing so, she noticed that the stained glass near the front door had a hole in it. Plywood had been placed behind the hole.

Mitchell contacted a neighbor and entered the residence. The interior was in disarray, and it appeared someone had been living there. Drawers were all open. The heat and television were on. Mattresses had been placed against windows. Art work was

gone from the walls. One of the missing paintings was worth about $47,000; a second was worth $14,500. Other missing items included the Volvo and a $1,600 coffee table.

Although Mitchell herself had not been inside the residence for about a month, her crew came every week and had not noticed or reported anything amiss. Mitchell believed that the Limbergs had last been to the residence about a year earlier.

Police lifted fingerprints from the Limberg residence. They found one print on some packaging tape that had been placed on an outside window. The fingerprint matched defendant.

Police also ran a records check on the Limbergs' Volvo. Department of Motor Vehicles records showed that Natalie Flores had filed a transfer application, which was dated October 26, 2009. The signatures on the transfer application were not those of Bette and Donald Limberg. The Volvo was found at Flores's residence, and Flores stated that defendant (her boyfriend) had purchased it for her.

Defendant was interviewed by the police on November 17, 2009. After he was advised of his *Miranda* rights and agreed to talk, the police told him that some fingerprints had been found at the Limberg residence.

Defendant admitted he had been inside the Limberg residence. Someone had called him and invited him over to look at items. He had previously told people to call him if they needed money. After receiving a call to go to a residence, he would go over and "it's 'grab somethin' if you like it.' " He would take anything he would "be able to get rid of." However, when he went to the Limbergs' residence, he did not see anything that he could use, so he left.

Defendant also explained why his girlfriend had the Volvo. Someone had called him about buying it a couple of days after going to the Limberg residence. He stated that he had purchased it in Prunedale, although he previously stated that he had purchased it in San Jose.

3

At the time of trial, Bette Limberg was in an assisted living facility and Donald Limberg had passed away.

### B. Robbery, Burglary, and False Imprisonment at the Williams Residence

Josephine Williams lived in Carmel in November 2009. She was in her late 80's at the time. Chun Kang worked as her caregiver.

Williams had been a customer of Jim's Window Cleaning for seven years. Defendant was employed by Jim's Window Cleaning during 2008 and 2009, and he had been to the Williams residence about three times. After his termination in April 2009, defendant did not return his uniform, which included a t-shirt and cap.

On November 13, 2009, defendant came to the door of the Williams residence in his Jim's Window Cleaning uniform. Kang answered the door. When defendant offered to clean the windows for free, Kang allowed him to enter. She was helping Williams in the bedroom, so she asked defendant to clean the windows in other rooms first. Kang later gave defendant access to the bedroom. Williams kept a heavy safe in her bedroom closet.

Kang heard a loud noise and went to investigate. She saw the front carpet gone and saw Williams's safe outside the front door. Defendant was next to the safe, dragging it. Kang asked defendant what he was doing and yelled, saying she was going to call 911. Defendant pushed Kang to the hallway and down onto the floor. He then ran back outside, where someone was waiting for him in a white car. Defendant did not get away with the safe. However, jewelry was missing from a drawer.

### C. Charges, Verdicts, and Sentence

Defendant was charged with second degree robbery of Kang (count 1; § 211), residential burglary of the Williams residence (count 2; § 459), false imprisonment of Kang (count 3; § 236), residential burglary of the Limberg residence (count 4; § 459), and grand theft auto of the Limberg vehicle (count 5; § 487, subd. (d)(1)). The

4

information also alleged that defendant had served three prior prison terms. (§ 667.5, subd. (b).)

The jury found defendant guilty of counts 1 through 4 but could not reach a verdict on count 5. The trial court declared a mistrial on count 5 (grand theft auto) and later dismissed it. Defendant waived jury trial on the prior prison term allegations and admitted them.

The trial court sentenced defendant to an 11-year, four-month prison term. It imposed the six-year upper term for the Limberg burglary (count 4); a consecutive one-year term for the robbery of Kang (count 1); a consecutive one-year, four-month term for the Williams burglary (count 2); and consecutive one-year terms for the three prior prison term allegations. The trial court stayed the term for the false imprisonment of Kang (count 3) pursuant to section 654. It also imposed a $6,600 restitution fine.

## DISCUSSION

### A.    *Residential Burglary – Count 4*

Defendant contends there was insufficient evidence to support his conviction of count 4, the Limberg burglary. Specifically, he contends there was insufficient evidence that the residence was inhabited.

#### 1.    **Standard of Review**

The standard of review for an appellate challenge to the sufficiency of the evidence to support a conviction is well-established. "The role of an appellate court in reviewing the sufficiency of the evidence is limited. The court must 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138.)

## 2.    Analysis

Burglary of "an inhabited dwelling house . . . is burglary of the first degree." (§ 460, subd. (a).)  For purposes of the burglary statutes, " 'inhabited' means currently being used for dwelling purposes, whether occupied or not." (§ 459.)

"Cases interpreting the term 'inhabited dwelling house' in section 460 . . . ha[ve] made it clear that this term should be construed to effectuate the legislative purposes underlying the statute, namely, to protect the peaceful occupation of one's residence. . . . '[A] person is more likely to react violently to burglary of his [or her] living quarters than to burglary of other places because in the former case persons close to him [or her] are more likely to be present, because the property threatened is more likely to belong to him [or her], and because the home is usually regarded as a particularly private sanctuary, even as an extension of the person.' [Citation.]  Courts specifically have recognized that the distinction between first and second degree burglary is founded upon the perceived danger of violence and personal injury that is involved when a residence is invaded." (*People v. Cruz* (1996) 13 Cal.4th 764, 775-776 (*Cruz*).)

Consistent with this legislative purpose, "[t]he term 'inhabited dwelling house' for many years has been considered a broad, inclusive definition [citation], and has been analyzed in terms of whether the dwelling was being used as a residence." (*Cruz, supra,* 13 Cal.4th at p. 776.)  Accordingly, an "inhabited dwelling house" is a place where a " 'person with possessory rights uses the place as sleeping quarters intending to continue doing so in the future' " (*ibid.*) or " 'a structure where people ordinarily live and which is currently being used for dwelling purposes.' " (*People v. DeRouen* (1995) 38 Cal.App.4th 86, 91 (*DeRouen*), disapproved on other grounds in *People v. Allen* (1999) 21 Cal.4th 846, 866.)  "The dispositive element is whether the person with the possessory right to the house views the house as his [or her] dwelling." (*People v. Cardona* (1983) 142 Cal.App.3d 481, 484.)  Conversely, "[a] structure that was once used for dwelling purposes is no longer inhabited when its occupants permanently cease using it as living

6

quarters, and no other person is using it as living quarters." (*People v. Rodriguez* (2004) 122 Cal.App.4th 121, 132.)

Courts have upheld first degree burglary convictions in many different situations involving temporary absences by the homeowners. For instance, courts have found that vacation homes are inhabited residences. (*DeRouen, supra,* 38 Cal.App.4th at p. 92.) Intent to use a residence as a dwelling may exist when a tenant is in the process of moving in or in the process of moving out. (*People v. Hernandez* (1992) 9 Cal.App.4th 438, 442; *People v. Hughes* (2002) 27 Cal.4th 287, 355 (*Hughes*).) Intent to use the structure as a dwelling can be shown by the presence of valuable personal items, the presence of the usual furnishings, or the fact that the utilities are on. (*DeRouen, supra,* at p. 92; *Hughes, supra,* at p. 355.)

In several cases, courts have upheld first degree burglary convictions where, as here, the elderly homeowners maintained their residences during long absences.

In *People v. Marquez* (1983) 143 Cal.App.3d 797 (*Marquez*), the homeowner had a conservatorship appointed over her and she was "confined to a boarding residence" at the time of the burglary. (*Id.* at p. 799.) She had not lived in the house for over a year, but a friend took care of the house and entered it frequently. Although there was a doubt as to whether the owner would ever actually return, there was substantial evidence she *intended* to do so. There was no evidence the owner "ever vacated or abandoned her residence to live in some other place." (*Id.* at p. 802.)

In *People v. Meredith* (2009) 174 Cal.App.4th 1257 (*Meredith*), the homeowner was hospitalized and then transferred to a skilled nursing facility. He instructed a friend to take care of his house, and he made it clear he wanted things to stay the way they were. The homeowner's son testified of the homeowner's intent to return. The court held that even without that direct testimony, the evidence supported a finding that the homeowner intended to return to his residence. Noting that the homeowner had asked his friend to "maintain the premises as is and did not direct him or authorize him to change anything,"

7

the court found that "[t]he only logical inference to draw . . . is that [the homeowner] intended to return." (*Id.* at p. 1268.)

This case shares several significant facts with the above cases. Here, the homeowners manifested an intention to return to their residence by maintaining it in a fully-furnished manner and leaving the utilities on. (See *Hughes, supra,* 27 Cal.4th at p. 355.) The Limbergs even maintained a vehicle on the premises. They also kept valuable art on the walls, which is consistent with an intent to continue using the house as a dwelling. (See *DeRouen, supra,* 38 Cal.App.4th at p. 92.) As in *Marquez* and *Meredith*, the Limbergs asked someone to check on the house regularly, including the interior, and they paid for regular outside maintenance.

Based on the evidence at trial, a reasonable trier of fact could have found, beyond a reasonable doubt, that the Limberg residence was inhabited at the time of the burglary. Substantial evidence therefore supports defendant's first degree burglary conviction.

### B.      *Circumstantial Evidence Instruction*

Defendant contends his conviction of count 4, the Limberg burglary, must be reversed because the trial court instructed the jury with the wrong circumstantial evidence instruction. The trial court gave CALCRIM No. 225, which pertains to circumstantial evidence of intent or mental state,[2] rather than CALCRIM No. 224, which pertains to circumstantial evidence of all elements of an offense.[3]

---

[2] As given, CALCRIM No. 225 provided: "The People must prove not only that the defendant did the acts charged, but also that he acted with a particular intent or mental state. The instruction for each crime explains the intent or mental state required. [¶] An intent or mental state may be proved by circumstantial evidence. Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to conclude that the defendant had the required intent or mental state, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required intent or mental state. [¶] (continued)

8

## 1. Invited Error/Ineffective Assistance of Counsel

After an in-chambers discussion of jury instructions, both parties withdrew their request for CALCRIM No. 224. Defendant acknowledges that trial counsel agreed to withdraw his request for CALCRIM No. 224, but argues that this was not invited error. We agree.

" 'The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal.' [Citation.] For the doctrine to apply, 'it must be clear from the record that defense counsel made an express objection to the relevant instructions. In addition, because important rights of the accused are at stake, it also must be clear that counsel acted for tactical reasons and not out of ignorance or mistake.' [Citation.] However, '[the] existence of some conceivable tactical purpose will not support a finding that defense counsel invited an error in instructions. The record must reflect that counsel

---

If you can draw two or more reasonable conclusions from the circumstantial evidence and one of those reasonable conclusions supports a finding that the defendant did have the required intent or mental state and another reasonable conclusion supports a finding that the defendant did not, you must conclude that the required intent or mental state was not proved by the circumstantial evidence. [¶] However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

[3] CALCRIM No. 224 provides: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

had a deliberate tactical purpose.' [Citation.]" (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1234.)

Here, we cannot say that defense counsel invited the error simply by agreeing that the trial court did not have to give the instruction. The record does not reflect that trial counsel induced the court not to give the instruction. Although the record is not clear, it appears that the trial court did not believe the instruction was appropriate, and both parties simply agreed to withdraw their request. There was no invited error. We therefore need not address defendant's claim that if there was invited error, he received constitutionally ineffective assistance of counsel.

### 2. Analysis

CALCRIM Nos. 224 and 225 both instruct the jury on the proper use of circumstantial evidence. CALCRIM No. 225 is to be used in place of CALCRIM No. 224 " 'when the defendant's specific intent or mental state is the only element of the offense that rests substantially or entirely on circumstantial evidence.' [Citations.]" (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1171-1172 (*Samaniego*).) Both instructions "provide essentially the same information on how the jury should consider circumstantial evidence, but CALCRIM No. 224 is more inclusive." (*Id.* at p. 1172.)

The more general circumstantial instruction (CALCRIM No. 224 or its predecessor CALJIC No. 2.01) is proper where issues such as identity rest primarily on circumstantial evidence. (*People v. Rogers* (2006) 39 Cal.4th 826, 885.) It is error to give the more specific instruction on circumstantial evidence of intent or mental state (CALCRIM No. 225 or its predecessor CALJIC No. 2.02) where the defendant's intent is not the only element of the prosecution's case resting on circumstantial evidence. (*People v. Rogers, supra,* at p. 885; *People v. Cole* (2004) 33 Cal.4th 1158, 1222.)

By the same token, the more general circumstantial instruction (CALCRIM No. 224 or its predecessor CALJIC No. 2.01) is only required where the prosecution's case substantially relies on circumstantial evidence. " '[W]here circumstantial inference

10

is not the primary means by which the prosecution seeks to establish that the defendant engaged in criminal conduct, the instruction may confuse and mislead, and thus should not be given.' [Citation.]" (*People v. Brown* (2003) 31 Cal.4th 518, 562 (*Brown*).) Thus, in *People v. Yeoman* (2003) 31 Cal.4th 93 (*Yeoman*), where the defendant made incriminating extrajudicial admissions, "the trial court reasonably determined for purposes of instructing the jury that the People's case did not rest substantially or exclusively on circumstantial evidence." (*Id.* at p. 143.)

In this case, circumstantial evidence was *not* the "primary means" by which the prosecution established defendant committed the Limberg burglary. (*Brown, supra,* 31 Cal.4th at p. 562.) Although there was some circumstantial evidence of his involvement in the burglary (defendant's fingerprint and his possession of the stolen vehicle), it merely corroborated the direct evidence of his involvement, which came from his admission to the police. As in *Yeoman,* the trial court could reasonably determine that, because defendant admitted entering the residence, "the People's case did not rest substantially or exclusively on circumstantial evidence." (*Yeoman, supra,* 31 Cal.4th at p. 143.) The real question was defendant's intent – that is, whether he entered the Limberg residence with intent to commit a felony. Since that question formed the crux of the case, it was appropriate for the trial court to give CALCRIM No. 225 rather than CALCRIM No. 224. (*Samaniego, supra,* 172 Cal.App.4th at p. 1171.) We find no error.

### C.     *Robbery – Use of Force*

Defendant argues that the evidence established that he had abandoned the safe at the time he used force on Kang, and that he used force only to facilitate his escape from the Williams residence. He contends there is a possibility that his robbery conviction was based on a legally inadequate theory of guilt, because the use of force in order to flee after abandoning property is not a robbery.

Defendant acknowledges that the record contains substantial evidence to support the robbery conviction, because he used force on Kang before escaping with the jewelry.

11

He claims, however, that the prosecutor and trial court erroneously led the jury to believe they could convict him of robbery of the safe even if he used force after abandoning the safe. He contends that because the record does not show that the jury relied on his taking of the jewelry rather than the safe, reversal is required under *People v. Guiton* (1993) 4 Cal.4th 1116, 1129 (*Guiton*) and *People v. Green* (1980) 27 Cal.3d 1 (*Green*), abrogated on other grounds by *People v. Martinez* (1999) 20 Cal.4th 225.

### 1.	Proceedings Below

At the end of the prosecution's case, defendant brought a motion for acquittal. (§ 1118.1.) With respect to the robbery charge, defendant argued that he did not use force or fear in an effort to steal the safe, but rather to facilitate his flight. The prosecutor argued that robbery was a continuing offense and that the use of force after the movement of the safe was sufficient under *People v. Estes* (1983) 147 Cal.App.3d 23 (*Estes*).

The trial court denied defendant's motion for acquittal. It noted that defendant had to go back inside the house in order to push Kang, so it was reasonable to believe that "he was not attempting to escape."

The trial court instructed the jury, pursuant to CALCRIM No. 1600, that in order to convict defendant of robbery, it had to find "the defendant used force or fear to take the property or to prevent the person from resisting." The trial court further instructed the jury, over defense objection, that "the People are not required to prove that the defendant escaped with the property."

During closing arguments, the prosecutor argued that defendant committed robbery "when he tried to drag that safe out of the house and he was stopped by Mrs. Kang and used force on her." The prosecutor reminded the jury that "the defendant need not escape with the property" and described a scenario where a shoplifter tries to flee with property and then struggles when caught. The prosecutor argued, "As soon as you take something, that theft morphs, develops into a robbery once that force is applied."

12

In response, trial counsel argued that defendant did not use force to take the safe, but in his flight. Trial counsel argued that it is "absolutely required" that the property "be removed by some kind of force or threat of violence." Trial counsel acknowledged that defendant pushed Kang, but asked, "Does he run and pick up the safe and go? Does he take the safe with him? No. He runs. He is fleeing because now he's going to get in trouble." Trial counsel emphasized that "the force required in robbery is the force to steal or attempt to steal the property. Not the force to flee." She argued that while defendant might be guilty of theft or attempted theft, "it is not a robbery because the force was not applied in an effort to take that safe . . . ."

In rebuttal, the prosecutor argued that it was a robbery if defendant used force on Kang "to prevent her from resisting him." She argued that a robbery occurs when a defendant applies force "while they are trying to keep that owner from resisting the taking."

### 2.    Law of Robbery

Robbery is defined as "the felonious taking of personal property in the possession of another, from his [or her] person or immediate presence, and against his [or her] will, accomplished by means of force or fear." (§ 211.)

In *Estes, supra,* 147 Cal.App.3d 23, the court clarified that the initial taking need not be performed in the immediate presence of the victim. Under *Estes,* "a robbery occurs when defendant uses force or fear in resisting attempts to regain the property or in attempting to remove the property from the owner's immediate presence regardless of the means by which defendant originally acquired the property." (*Id.* at pp. 27-28.)

Based on the *Estes* rule, courts have upheld robbery convictions where the defendant only used force when resisting an attempt to regain the property and ultimately abandoned the property. For instance, in *People v. Pham* (1993) 15 Cal.App.4th 61 (*Pham*), the two victims confronted the defendant when he was stealing property from their car. The defendant began to flee with the property, but the victims chased him. As

13

he was caught, the defendant dropped the property and struggled with the victims, who were eventually able to subdue the defendant. On appeal, the defendant argued that he did not commit robbery, since he only used force after dropping the property. The appellate court rejected this claim, explaining that the defendant's asportation of the property "continued while [he] struggled with the victims and prevented them from immediately recovering their goods." (*Id.* at p. 65.)

A robbery conviction was likewise upheld in *People v. Torres* (1996) 43 Cal.App.4th 1073 (*Torres*), disapproved on other grounds by *People v. Mosby* (2004) 33 Cal.4th 353 at page 365, footnote 3. In *Torres*, the victims found the defendant in their car, unplugging the stereo. While still in the car, the defendant swung a screwdriver at one of the victims. He got out of the car, holding the stereo, but put it back in the car before fleeing. On appeal, the defendant contended "the stereo was initially obtained without threat or any use of force and was then abandoned by defendant without any attempt to retain it through threat or use of force." (*Torres, supra,* at p. 1078.) The *Torres* court rejected the insufficiency of the evidence claim, finding that when he swung at the victim with a screwdriver, he had "used force or fear to prevent [the victim] from regaining the car stereo." (*Id.* at p. 1079.)

Defendant contends this case is unlike *Pham* or *Torres* because he actually abandoned the safe before using any force. He asserts that if the thief used force only in an attempt to escape rather than in an attempt to retain the property, no robbery has been committed.

Defendant asserts, and the Attorney General does not dispute, that a person does not commit robbery if he or she uses force only in an attempt to escape after abandoning the stolen property. (See *Pham, supra,* 15 Cal.App.4th at p. 68 [stating, in dicta, that a defendant who "truly abandoned the victims' property before using force . . . could be guilty of theft, but not of an *Estes*-type robbery"]; compare *People v. Flynn* (2000)

14

77 Cal.App.4th 766, 772 [stating, in dicta, that "The use of force or fear to escape … constitutes robbery."].)

### 3.     Legal Insufficiency and Factual Insufficiency

According to defendant, the jury here was erroneously permitted to convict him of robbery even if it found that he "truly abandoned the victim['s] property before using force." (*Pham, supra,* 15 Cal.App.4th at p. 68.)  Defendant contends that his argument concerns legal insufficiency, rather than factual insufficiency, prosecutorial misconduct, or instructional error.

In *Green, supra,* 27 Cal.3d 1, the California Supreme Court announced the following rule: "[W]hen the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand." (*Id.* at p. 69.)  Legal insufficiency exists "when the facts do not state a crime under the applicable statute." (*Guiton, supra,* 4 Cal.4th at p. 1129.)  When the "inadequacy is legal," reversal is required "absent a basis in the record to find that the verdict was actually based on a valid ground." (*Ibid.*, fn. omitted.)

Factual insufficiency, in contrast, is the "kind the jury is fully equipped to detect." (*Guiton, supra,* 4 Cal.4th at p. 1129; see also *Griffin v. United States* (1991) 502 U.S. 46, 59.)  When the inadequacy is merely factual, reversal is not required as long as "a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground." (*Guiton, supra,* at p. 1129)

In *Green,* the defendant was charged with kidnapping.  The evidence established three separate movements of the victim. (*Green, supra,* 27 Cal.3d at pp. 62-63.)  The trial court's instructions and prosecutor's arguments had permitted the jury to convict the defendant of kidnapping based on any of the three movements, even though two movements were in fact insufficient under the law at the time. (*Id.* at p. 68.)  Because

15

there was no way to determine whether or not the jury's verdict rested on one of the legally insufficient movements, reversal was required. (*Id.* at p. 71.)

In *Guiton*, the defendant was charged with selling or transporting narcotics, even though the evidence showed he only transported narcotics and did not engage in any sales. (*Guiton, supra,* 4 Cal.4th at p. 1120.) Although the trial court should not have given an instruction regarding sales, the instructions and arguments enabled the jury to weed out the improper theory. (*Id.* at p. 1131.)

More recently, in *People v. Morales* (2001) 25 Cal.4th 34 (*Morales*), the prosecutor argued that the defendant could be found guilty of possessing narcotics even if the evidence only established he was under the influence of narcotics. The defendant claimed this was a legally incorrect theory. The *Morales* court found it was neither a question of legal insufficiency under *Green* nor factual insufficiency under *Guiton* – the true issue was prosecutorial misconduct. (*Id.* at p. 43.) Noting that it was a "close" question whether the prosecutor had misstated the law (*id.* at p. 45), the court found no basis for reversal, since the instructions were correct and "did not permit a conviction solely on evidence of intoxication." (*Id.* at p. 47.)

In this case, there is no legal insufficiency as in *Green*. The robbery instructions were correct. The jury was properly told that in order to convict defendant of robbery, it had to find "the defendant used force or fear to take the property or to prevent the person from resisting." The trial court further instructed the jury that "the People are not required to prove that the defendant escaped with the property," which was also a correct statement of law. (See *Pham, supra,* 15 Cal.App.4th at p. 65; *People v. Green* (1979) 95 Cal.App.3d 991, 1000 [robbery does not require that the thief " 'escape with the loot' to a 'place of temporary safety' "]; *People v. Nazzaro* (1963) 223 Cal.App.2d 375, 381 ["carrying away" element of robbery is met if defendant removes the property "from the place where it was kept by the owner" and "obtains possession and control of the property at least for a fraction of time"].)

16

Likewise, the prosecutor's argument was correct. The prosecutor did not argue that the jury could convict defendant if he abandoned the safe before pushing Kang. She correctly argued that a robbery occurs when a thief applies force "while they are trying to keep that owner from resisting the taking." If defendant believed that the prosecutor misstated the law, he was required to object. (See *Morales, supra,* 25 Cal.4th at pp. 43-44.) "Moreover, we presume that the jury relied on the instructions, not the arguments, in convicting defendant." (*Id.* at p. 47.)

Ultimately, defendant's argument is one of factual insufficiency. He argues that if the jury found that he intended to abandon the safe before he pushed Kang, he could not have been convicted of robbery. Yet if the jury found that he pushed Kang with the intention of retaining possession of the safe or escaping with the jewelry, his conviction would be proper. Based on the instructions and arguments of both counsel, the jury here was "fully equipped to detect" that abandonment of the safe before the application of force would not constitute a robbery. (*Guiton, supra,* 4 Cal.4th at p. 1129.) Thus, reversal is not required as long as "a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground." (*Ibid.*)

Here, after hearing the evidence, instructions, and arguments of counsel, a reasonable jury could have found, beyond a reasonable doubt, that defendant used force to temporarily retain possession of the safe, not solely to facilitate his escape. As the trial court pointed out, if defendant's sole intent was to abandon the safe and flee, he had no need to come back into the house to push Kang. A reasonable jury could have determined that defendant did not voluntarily relinquish possession of the safe before he pushed Kang. The evidence supported a finding that defendant intended to retake possession of the safe, thinking better of it only when he realized it was too heavy to get away with quickly. Further, as defendant himself admits, the jury could have based the robbery conviction on his taking of Williams's jewelry.

17

On the record here, there is no affirmative indication that the jury's verdict rested upon the finding that defendant abandoned the safe before applying force on Kang. (*Guiton, supra,* 4 Cal.4th at p. 1129.) Thus, reversal is not required.

### D.      *Robbery – Constructive Possession*

Defendant also contends his robbery conviction must be reversed because there was insufficient evidence that Kang had constructive possession of Williams's property. Specifically, defendant contends that the record does not contain substantial evidence that Kang was Williams's employee, rather than an independent contractor.

" 'A robbery cannot be committed against a person who is not in possession of the property taken or retained. [Citation.] Possession may be actual or constructive. [Citation.] "A person who owns property or who exercises direct physical control over it has possession of it, but neither ownership nor physical possession is required to establish the element of possession for purposes of the robbery statute." [Citation.] " '[T]he theory of constructive possession has been used to expand the concept of possession to include employees and others as robbery victims.' " [Citation.] [¶] . . . [A]ll employees on duty have constructive possession of their employer's property and may be separate victims of a robbery.' [Citation.] In addition, 'persons other than employees may be robbery victims if they have a " 'special relationship' with the owner of the property such that the victim had authority or responsibility to protect the stolen property on behalf of the owner." [Citation.] Formulated another way, the question is whether the prospective victim "may be expected to resist the taking." [Citation.]' [Citation.]" (*People v. McKinnon* (2011) 52 Cal.4th 610, 687.)

Defendant asserts that only true employees can have constructive possession of property, and that independent contractors cannot, because only employees have the requisite special relationship with the employer. For this proposition, defendant relies on *People v. Scott* (2009) 45 Cal.4th 743 (*Scott*). In *Scott*, the California Supreme Court held that "all employees have constructive possession of the employer's property while

on duty and thus may be separate victims of a robbery of the employer's business." (*Id.* at p. 746.) The court reached this conclusion by finding that "the employee's relationship with his or her employer constitutes a 'special relationship' sufficient to establish the employee's constructive possession of the employer's property during a robbery." (*Id.* at p. 754.)

Defendant asserts that the "implication" of the court's holding in *Scott* "was that the close working relationship between employer and employee is one that automatically can be characterized as 'special' within the context of constructive possession and robbery." Defendant then jumps to the further conclusion that an independent contractor does not have the requisite special relationship with the employer.

Defendant's claim is not supported by case law. In several cases, independent contractors were found to have constructive possession of property. In *People v. Bradford* (2010) 187 Cal.App.4th 1345, security guards employed by a shopping mall had constructive possession of property that was owned by one of the stores in the mall. (*Id.* at p. 1350.) In *People v. Gilbeaux* (2003) 111 Cal.App.4th 515 (*Gilbeaux*), janitors employed by an independent cleaning service had "a special relationship" with the store "that made them akin to employees," since they were "part of the group of workers in charge of the premises at the time of the robbery." (*Id.* at p. 523.)[4]

Contrary to defendant's claim, *Scott* does not establish a distinction between employees and independent contractors. Rather, *Scott* recognizes a distinction between persons who have a special relationship with the actual property owner and persons who are simply "bystanders who have no greater interest in the property than any other member of the general population." (*Scott, supra,* 45 Cal.4th at p. 758; see *Sykes v.*

---

[4] Defendant argues that *Gilbeaux* was wrongly decided and conflicts with *Scott*. However, in *Scott*, the California Supreme Court discussed *Gilbeaux* with approval. (*Scott, supra,* 45 Cal.4th at p. 754.)

*Superior Court* (1994) 30 Cal.App.4th 479, 484 [security guard employed by a neighboring business had no special relationship with property owner; he was simply acting as "a neighbor and good citizen"].)

Thus, we need not determine whether Kang's actual employment relationship with Williams was one of employee or independent contractor, but merely whether she had a special relationship with Williams, in which she was "in charge of the premises at the time of the robbery." (*Gilbeaux, supra,* 111 Cal.App.4th at p. 523; see *People v. Downs* (1952) 114 Cal.App.2d 758, 766 (*Downs*) [robbery statute is "applicable to any servant or servants left in sole occupation of the premises or particular part thereof by the employer"].)

Contrary to defendant's contention, the record does not need to contain specific evidence of Kang's working hours or the regularity with which she worked for Williams in order to provide substantial evidence that Kang had a special relationship with Williams at the time of the robbery. (See *People v. Neely* (2009) 176 Cal.App.4th 787, 794 [although not an official employee with regular hours or pay, victim's "presence in the store performing services for the store, coupled with his relationship to the store owner, provided substantial evidence that he constructively possessed the store's property for purposes of the robbery statute"].) Whether employee or independent contractor, Kang was the caregiver for Williams, helping her with household tasks that included personal care for Williams as well as directing an apparent window washer to the rooms that could be cleaned. The record contains substantial evidence that Kang was not a mere bystander (see *Scott, supra,* 45 Cal.4th at p. 758) but a household servant with authority over the premises. (See *Gilbeaux, supra,* 111 Cal.App.4th at p. 523; *Downs, supra,* 114 Cal.App.2d at p. 766.)

In sum, we reject defendant's claim that there was insufficient evidence that Kang had constructive possession over Williams's property.

20

### E. Robbery – Caretaker Instruction

Defendant contends his robbery conviction must be reversed because the trial court directed a verdict for the prosecution when it told the jury that "[a] caretaker who is on duty has possession of the owner's property."

#### 1. Proceedings Below

When the parties discussed the jury instruction for robbery, the prosecutor noted that CALCRIM No. 1600 had an optional paragraph pertaining to constructive possession of a store or business owner's property. The optional paragraph provides: "A (store/ [or] business) (employee/ <insert description>) who is on duty has possession of the (store/ [or] business) owner's property." (CALCRIM No. 1600.)

The prosecutor asked the trial court to fill in "caretaker" where the instruction provided "a blank spot." Trial counsel stated, "I don't think it's inappropriate to put 'caretaker.' I would prefer 'employee,' but I can understand the request for 'caretaker' because that's what Mrs. Kang said she was." The trial court asked, "So you want 'a caretaker who is on duty has possession of the owner's property,' is that what you're looking for?" The prosecutor responded, "Yes," and trial counsel did not object.

The trial court later instructed the jury, "A caretaker who is on duty has possession of the owner's property."

#### 2. Analysis

"Under established law, instructional error relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violates the defendant's rights under both the United States and California Constitutions." (*People v. Flood* (1998) 18 Cal.4th 470, 479-480 [error to instruct jury that particular officers were "peace officers" in prosecution for evading a peace officer].)

"[T]he constitutional right to a jury trial means that 'no matter how conclusive the evidence, a trial court cannot directly inform the jury that an element of the crime charged has been established. Absent a stipulation by the defendant that an element is

21

established or is admitted, the trial court must submit that question to the jury.' [Citations.] ' "The prohibition against directed verdicts 'includes perforce situations in which the judge's instructions fall short of directing a guilty verdict but which nevertheless have the effect of so doing by eliminating other relevant considerations if the jury finds one fact to be true.' [Citation.] ... '[N]o fact, not even an undisputed fact, may be determined by the judge.' [Citations.]" [Citation.]' [Citations.] '[I]t matters not whether the issue in question is one of fact or law. Due process requires that it be submitted to the jury.' [Citation.] 'If a judge were permitted to instruct the jury on the basis of assertedly "undisputed" evidence that a particular element had been established as a matter of law, the right to a jury trial would become a hollow guarantee.' [Citations.]" (*People v. Yarbrough* (2008) 169 Cal.App.4th 303, 315 (*Yarbrough*).)

Cases have carefully distinguished between (a) instructions that tell the jury that particular facts satisfy an element of the offense and (b) instructions that allow the jury to determine whether such facts exist. For instance, in *People v. Thorn* (2009) 176 Cal.App.4th 255 (*Thorn*), the defendant took property from a car that was parked in a carport underneath an apartment building. The trial court added the following sentence to the burglary instruction: " 'A carport that is attached to an inhabited dwelling house is part of the inhabited dwelling house.' " (*Id.* at p. 266.) On appeal, the defendant contended that this instruction directed a verdict on the element of habitation, but the appellate court disagreed. The court explained that the jury still had to make a number of findings in order to convict the defendant. Specifically, the jury could not return a guilty verdict unless it found that the apartment complex was inhabited and that the carport was attached to the inhabited structure. (*Id.* at p. 268.) "[H]ad the jury determined the apartment structure was not inhabited or the garage was not attached to it, it would have been obligated to return a not guilty verdict on the first degree burglary charge." (*Ibid.*)

In *Yarbrough,* the defendant was convicted of carrying a loaded firearm in a public place. (§ 12031, subd. (a)(1).) While possessing the firearm, he had been part of a group

22

"clustered near the 'sidewalk area' " in front of a driveway. (*Yarbrough, supra,* 169 Cal.App.4th at p. 307.) In response to a jury question, the trial court instructed the jury that " '[t]he area in front of a home, including a private driveway, is a public place if it is reasonably accessible to the public without a barrier.' " (*Id.* at p. 315.) Contrary to the defendant's claim, this instruction did not direct a verdict on the "public place" element of section 12031, subdivision (a)(1). "Instead, the instruction left the jury with the task of making two essential factual determinations based upon the evidence as a prerequisite to a guilty verdict on count 2: first, that defendant was on the driveway; and second, that the driveway was reasonably accessible to the public." (*Yarbrough, supra,* at p. 316.)

In the instant case, the jury was told, "A caretaker who is on duty has possession of the owner's property." The trial court did not tell the jury that Kang was a caretaker or that she was on duty at the time of the robbery. The jury still had to make those determinations. Although these elements were not subject to much dispute at trial, nevertheless they were not conclusively established by the evidence. Had the jury determined that Kang was not a caretaker and/or that she was not on duty at the time of the robbery, it would have been obligated to return a not guilty verdict on that count. (See *Thorn, supra,* 176 Cal.App.4th at p. 268.) Thus, we find no instructional error.

### F. Section 654

Defendant contends that the trial court should not have separately punished the Williams burglary and Kang robbery. He claims that section 654 precludes multiple punishment because those two offenses were committed pursuant to the same objective: taking property from the Williams residence. For the same reason, he claims that the restitution fine must be reduced.

#### 1. Section 654 Principles

Section 654, subdivision (a) provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the

23

provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

"The purpose of section 654 is to prevent multiple punishment for a single act or omission, even though the act or omission violates more than one statute and thus constitutes more than one crime. Although the distinct crimes may be charged in separate counts and may result in multiple verdicts of guilt, the trial court may impose sentence for only one offense – the one carrying the highest punishment. [Citation.]" (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1135, fn. omitted.) "Section 654 bars multiple punishment for an indivisible course of conduct which violates more than one statute, and divisibility depends in turn on the defendant's intent: if all his offenses were 'incident to one objective,' the defendant may be punished only once. [Citation.]" (*People v. James* (1977) 19 Cal.3d 99, 119.)

Whether there was a single intent and objective within the meaning of section 654 is a factual determination that must be upheld on appeal if it is supported by substantial evidence. (*People v. Osband* (1996) 13 Cal.4th 622, 730.)

### 2. Application of Section 654 in Burglary-Robbery Cases

Defendant relies on two cases also involving burglary and robbery charges in which section 654 required the stay of one count. In *People v. Le* (2006) 136 Cal.App.4th 925 (*Le*), the defendant was the driver in the burglary of a drugstore. The store managers came out to the vehicle and struggled with the defendant while trying to prevent him from driving away. The trial court separately punished the burglary and robbery, but on appeal the People conceded that section 654 applied. This court found the concession appropriate, since both offenses were committed pursuant to the objective of stealing merchandise from the store. (*Id.* at p. 931.)

Likewise, section 654 precluded separate sentences for burglary and robbery charges in *People v. Guzman* (1996) 45 Cal.App.4th 1023 (*Guzman*). In *Guzman*, the defendant was one of a group who took a motorcycle from the victim's garage, then

24

drove it away in a truck. The victim followed the group and managed to block their vehicle. The defendant and others then assaulted the victim, in response to his effort "to retain the motorcycle." (*Id.* at p. 1028.) Thus, "the burglary was still in progress when [the defendant] committed robbery and both offenses were committed pursuant to one objective and there was but a single continuous course of conduct." (*Ibid.*)

The People rely on two cases involving section 654's application to burglary and assault convictions. In *People v. Vidaurri* (1980) 103 Cal.App.3d 450 (*Vidaurri*), the defendant was stopped by two security guards in a parking lot, after he left a store with two blouses. The defendant pulled a knife and used it to assault the security guards as well as two other men in the parking lot. Convicted of assaulting each of the four victims as well as burglary of the store, the defendant claimed that section 654 precluded separate punishment for the burglary. The court held that multiple punishment was permissible because "the assaults were committed in response to the unforeseen circumstance[,] the approach of the Sears security guards." (*Vidaurri, supra,* at pp. 465-466.)

In *People v. McGahuey* (1981) 121 Cal.App.3d 524 (*McGahuey*), the victim awoke after the defendant entered her home and stole money from her wallet. As she called the police, the defendant threw a hatchet through a window, "narrowly missing her." (*Id.* at p. 528.) On appeal, he claimed his burglary and assault convictions were incident to a single intent and objective. The court disagreed, explaining that the evidence supported a finding that the burglary was complete when the defendant left the victim's home and that "[h]e then formed the intent to prevent [the victim] from calling the police by throwing the hatchet through the window at her." (*Id.* at p. 529.)

One court has addressed "the apparent distinction between" the burglary/robbery cases (*Le* and *Guzman*) and the burglary/assault cases (*Vidaurri* and *McGahuey*). (*People v. Perry* (2007) 154 Cal.App.4th 1521, 1526 (*Perry*).) The *Perry* court noted there is a "difference between the intent necessarily reflected in convictions of robbery and assault." (*Ibid.*) "Assault reflects an intent to perform an act that, by its nature, will

25

probably and directly result in the application of physical force to another person. [Citation.] Robbery, while involving the use of force or fear, reflects an intent to deprive the victim of property. Accordingly, a conviction of assault committed during an escape with property taken during a burglary reflects, in essence, an intent to apply, attempt to apply, or threaten to apply force to a person, rather an intent to steal property. The objective of such an assault generally will be to deter, interrupt or put a stop to a pursuit or other effort to capture the defendant and any property taken during the burglary. However, if property is taken during a burglary and a robbery pertaining to the same property is committed during the escape, the objective is still essentially to steal the property. Admittedly, an additional objective of preventing the victim or another person from taking back the property generally will exist, but may be incidental to, rather than independent of, the objective of stealing the property." (*Id.* at pp. 1526-1527.) The *Perry* court further acknowledged that in some cases, the degree of force applied might show a separate intent. (*Id.* at p. 1527.)

In *Perry,* the defendant was convicted of vehicular burglary and robbery. The victim had discovered the defendant inside his car. The defendant jumped out of the car, holding the car stereo and a screwdriver or ice pick. He ran, but the victim chased him. During the chase, the defendant faced the victim, holding the weapon, in a " 'fighting stance,' " a number of times. (*Perry, supra,* 154 Cal.App.4th at p. 1524.) The *Perry* court found that section 654 prohibited multiple punishment for the burglary and robbery explaining that the objective of both offenses was the theft of the car stereo. "Although the robbery entailed a different type of action, i.e., the implied threat to use the screwdriver or ice pick, the underlying objective was necessarily identical: to steal [the] car stereo." (*Id.* at p. 1527.) Although the defendant may also have had "wanted to evade capture," his attempt to escape "was merely incidental to, or the means of completing the accomplishment of the objective of taking the stereo." (*Ibid.*)

26

Here, defendant was convicted of burglary and robbery, not assault. He was also convicted of false imprisonment, but the parties agreed that section 654 prohibited separate punishment for that count. The trial court made no specific factual findings with respect to defendant's objective in using force on Kang. However, as discussed above, in convicting defendant of robbery, the jury necessarily found that defendant used force to prevent Kang from retaining the safe and/or jewelry (the objects of the burglary). Even if defendant also wanted to prevent Kang from calling the police immediately, his underlying objective was still the same: to enable him to maintain possession of the safe and/or jewelry. Thus, defendant should not have been separately punished for the robbery and the burglary. Because the burglary "provides for the longest potential term of imprisonment," the robbery count should have been stayed pursuant to section 654.

### 3. Application of Section 654 to Restitution Fines

At sentencing, the trial court specified that it was imposing a $6,600 restitution fine (§ 1202.4, subd. (b)) calculated by multiplying $200 by 11 years and by the number of convictions for which it was imposing sentence (three). It imposed a parole revocation fine (§ 1202.45) in the same amount. Defendant contends that under section 654, both fines should be reduced to $4,000.

In *Le, supra,* 136 Cal.App.4th at page 934, this court held "that the section 654 ban on multiple punishments is violated when the trial court considers a felony conviction for which the sentence should have been stayed pursuant to section 654 as part of the court's calculation of the restitution fine under the formula provided by section 1202.4, subdivision (b)(2)."

Here, under the principles established in *Le,* we agree that defendant's restitution fine and parole revocation fine should be reduced to $4,000 each because the robbery should have been stayed pursuant to section 654.

27

## DISPOSITION

The judgment is ordered modified to provide that the punishment for the conviction of robbery (count 1; § 211) is ordered stayed pursuant to Penal Code section 654. The judgment is further ordered modified to provide that the restitution fine imposed pursuant to Penal Code section 1202.4, subdivision (b) is $4,000, and that the parole revocation fine imposed pursuant to Penal Code section 1202.45 is $4,000. As so modified, the judgment is affirmed. The superior court is ordered to send a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____
ELIA, ACTING P.J.

_____
MÁRQUEZ, J.

28